IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| CHARLES D. STARK AND TODD J. STARK, CO-TRUSTEES OF THE HAROLD W. CONROY TRUST "C," <br><br> Plaintiffs, <br><br> vs. <br><br> GERALD KWOCKHEN WONG, individually; CLYDE TAKASHI KANESHIRO, individually; ROBIN JOY ISHIBASHI, individually; C&A INVESTMENT, LLC, a Hawaii limited liability company; and REAL ESTATE DELIVERY 2, INC., a Hawaii corporation, <br><br> Defendants. | Civ. No. 25-00207 MWJS-RT <br><br> AMENDED ORDER CERTIFYING QUESTIONS OF LAW TO THE HAWAIʻI SUPREME COURT |

**INTRODUCTION**

A large commercial building in Lahaina was destroyed in the catastrophic

August 2023 fires on Maui.  Plaintiffs, the trustees of a trust that owned the building,

bring this lawsuit in the wake of those fires.  They contend that the building's lessee

breached the lease by failing to maintain adequate insurance to cover the costs of

rebuilding.  Plaintiffs also sue several prior lessees who had sold and assigned their

leasehold before the fires—including an entity that briefly held the lease following a

foreclosure sale—on the theory that, under Hawai'i state law, the prior lessees are also on the hook for the inadequate insurance as well as for unpaid rent.

Because this case raises legal questions that are important and likely to recur, because there is no clear controlling precedent in Hawai'i judicial decisions, and because the questions are determinative of the cause, this court certifies the questions to the Hawai'i Supreme Court under Hawai'i Rule of Appellate Procedure 13(a).

The questions are:

1.      When a ground lease requires that a lessee "will at its own expense keep all buildings and improvements on the demised land insured against loss or damage by fire with extended coverage . . . in an amount as near as practicable to the replacement cost thereof," at what point in time is the adequacy of insurance to be measured—at the time the insurance was procured or after a catastrophic fire loss has occurred?  If adequacy is measured after the fact, should it nonetheless exclude "surge" pricing resulting from the widespread destruction of an entire geographic area?

2.      Do a lessee's rent obligations continue under a ground lease following the total and unforeseen destruction of not only the leasehold improvements, but an entire geographic area?

3.      To what extent, if any, does a former lessee who relinquished possession, occupancy, and control of a ground lease remain liable for alleged breaches occurring after assignment?

4.      Does a purchaser who acquires a leasehold estate via a court-ordered foreclosure sale and a foreclosure commissioner's quitclaim assignment of the lease remain liable for the lessee's covenants after a subsequent assignment of the leasehold estate?

//

//

//

2

## BACKGROUND

**A.      Factual Background**

On August 8, 2023, "fire devastated Lahaina, the former capital of the Hawaiian Kingdom." *Burnes v. Hawaiian Elec. Co., Inc.*, 158 Hawaiʻi 21, 25, 583 P.3d 794, 798 (2026). More than "one hundred people lost their lives," hundreds "suffered physical and emotional injuries," and "[p]roperties and historic sites were destroyed." *Id.*

Plaintiffs in this lawsuit are Charles D. Stark and Todd J. Stark, co-trustees of the Harold W. Conroy Trust "C," dated February 25, 1974 (the "Trust"). Dkt. No. 1, at PageID.3. As alleged in the complaint, the Trust is the "owner of a fee-simple property consisting of 40,330 square feet, having an address of 1000 Limahana Place, Lahaina, Hawaii 96761." *Id.* at PageID.4. That property "had a commercial building consisting of approximately 20,000 interior square feet, which was partitioned into various commercial tenant buildings, which was sub-leased to various sub-tenants." *Id.* That commercial building was destroyed by the Maui fires. *Id.*

The questions in this lawsuit concern, at bottom, who should bear the economic consequences of the fire damage. At the time of the fires, Defendant C&A Investment, LLC ("C&A") held the ground lease. *Id.* at PageID.7-8. Under the terms of that lease, C&A was required to maintain replacement coverage insurance on the property and was required, in the case of casualty, to rebuild the building. The lease states:

> That the Lessee will at its own expense at all times during said term keep all
> buildings and improvements now or hereafter erected on the demised land

3

> insured against loss or damage by fire with extended coverage in a responsible insurance company authorized to do business in Hawaii, in an amount as near as practicable to the replacement cost thereof, in the joint names of the Lessors and Lessee, payable in case of loss to the Lessors and Lessee as their interests may appear . . . and any money derived therefrom in case of loss shall be used as soon as reasonably possible by the Lessee for rebuilding, repairing or otherwise reinstating the same buildings in a good and substantial manner according to the plan and elevation of the buildings so destroyed or damaged or such modified plan as shall be approved by the Lessors . . . .

Dkt. No. 1, at PageID.8. Having imposed the obligation to "keep all buildings and improvements . . . insured against loss or damage by fire . . . in an amount as near as practicable to the replacement cost thereof," the lease goes on to provide for what will happen if insurance proceeds fall short: "in case said moneys received shall be insufficient in amount for such construction, the Lessee shall make up the deficiency out of its own funds . . . ." *Id.*

To meet its obligations under the lease, C&A obtained a $2 million insurance policy. This was based on a $1.8 million estimate for total reconstruction that was prepared by an independent insurance agent just three months before the Maui fires. Dkt. No. 109, at PageID.1065; Dkt. No. 103, at PageID.782. But while the lease required C&A to name the Trust as a joint insured, C&A placed the insurance only in its own name, and the Trust took no action to have itself added.

After the Maui fires, and the complete destruction of the commercial building, C&A received the $2 million payout from the insurance company. C&A then refused to turn over the $2 million to the Trust.

4

B. **Procedural History**

1. **The Complaint**

Plaintiffs filed their complaint in this court on May 20, 2025. Dkt. No. 1. As Plaintiffs are citizens of the State of California and Defendants are all citizens of the State of Hawaiʻi, the complaint invokes this court's diversity jurisdiction under 28 U.S.C. § 1332.

In their complaint, Plaintiffs allege that the total replacement costs are at least $8 million, and they contend that C&A should be ordered to cover the difference between those costs and the $2 million in insurance proceeds. Dkt. No. 1, at PageID.9. Plaintiffs acknowledge that a material component of their $8 million estimate is driven by "[s]urge," namely, the "market conditions created by the mass wildfire catastrophe" which have made construction far more expensive than if the commercial building was the only structure in Lahaina to have burned down at that time. Dkt. No. 147, at PageID.2229.

Plaintiffs do not limit their recovery efforts to C&A. Instead, they have named prior lessees as Defendants in this lawsuit: Gerald Kwockhen Wong, Clyde Takashi Kaneshiro, and Robin Joy Ishibashi, who purchased an assignment of the lease in 1989, and who sold it to a non-party, Calhoun LLC ("Calhoun"), in 2004. Dkt. No. 103-1, at PageID.779-80. Plaintiffs also name Real Estate Delivery 2, Inc. ("RED2")—a wholly-owned subsidiary of First Hawaiian Bank ("FHB")—which took title to the lease

through a commissioner's quitclaim assignment of lease in August 2010, after Calhoun

defaulted on the mortgage it had obtained from FHB for the lease purchase.  *Id.* at

PageID.780.  RED2 sold a lease assignment to C&A in September 2011.  *Id.* at

PageID.781-82.  Plaintiffs' position is that Wong, Kaneshiro, Ishibashi, and RED2 are all

jointly liable for C&A's alleged failure to maintain adequate insurance.

In addition, Plaintiffs allege that C&A stopped paying the required rent in April

2024, and that the prior lessees are jointly liable for this outstanding rent.  Dkt. No. 103-

1, at PageID.779.  And while the commercial building has been destroyed, Plaintiffs take

the position that Defendants are liable not only for past unpaid rent, but for all future

rent through the life of the lease.  Plaintiffs estimate that this comes out to $1,832,936.60.

*Id*. at PageID.783.

The complaint advances these contentions in three counts.  Dkt. No. 1, at

PageID.9-12.  Count One is a breach of contract claim brought against all Defendants.  It

alleges that C&A failed to maintain adequate insurance to replace the building, and that

C&A has failed to replace the building according to its original plans.  It also alleges

that C&A has failed to pay past rent due.  And it further alleges that the remaining

Defendants are jointly and severally liable for these breaches.

Count Two is brought solely against C&A and requests a preliminary injunction.

It alleges that C&A has refused to turn over the $2 million insurance payout to

Plaintiffs.  Plaintiffs "request that C&A be preliminarily and permanently enjoined from

disbursing, wasting, spending, comingling, or converting any monies recovered by C&A from the insurance proceeds." *Id.* at PageID.10.[1]

Finally, Count Three is an unjust enrichment claim brought solely against C&A. Plaintiffs allege that C&A received the $2 million in insurance proceeds as a result of its insurance claim following the Maui fires; that C&A's retention of those insurance proceeds is improper and serves to unjustly benefit C&A; and that the court should "order that the fire proceeds C&A received" be "held in constructive trust for the benefit" of Plaintiffs. *Id.* at PageID.11-12.

### 2.    Discovery and Expert Reports

After the filing of the complaint, the parties engaged in discovery practice. And only Plaintiffs and Defendants Kaneshiro and Ishibashi timely noticed experts under Federal Rule of Civil Procedure 26(a)(2). Dkt. No. 147, at PageID.2227. Plaintiffs' expert estimates that the cost of rebuilding—including the surge factor—is $8,416,465. *Id.* Defendants Kaneshiro and Ishibashi's expert did not include the surge factor, and came up with an estimate of $6,998,024. *Id.* The difference between these estimates is driven almost entirely by Plaintiffs' expert's decision to include the surge factor. *Id.* at PageID.2230 (noting the "[s]urge factor alone accounts for $948,440 of the difference").

---

[1]    The parties eventually entered a stipulation under which the $2 million in insurance proceeds were deposited with this court's Clerk of Court for safekeeping. Dkt. No. 83 (Stipulation and Order); *see also* Dkt. No. 89 (Receipt of Funds).

### 3.   The Cross-Motions for Summary Judgment

On February 27, 2026, Plaintiffs filed a motion for partial summary judgment limited to Count One of the complaint.  Dkt. No. 103, at PageID.768.  Although Plaintiffs acknowledge that the total cost of rebuilding must be determined at trial, they ask for an order resolving certain legal issues.  First, they ask this court to rule that what counts as "adequate insurance" must be determined after a property has been damaged by fire; in Plaintiffs' view, it is irrelevant that the amount of insurance might have appeared to be reasonable beforehand.  Second, because the $2 million in insurance proceeds are not enough to actually rebuild, Plaintiffs ask for a ruling that C&A must cover the difference out of its own funds.  Third, Plaintiffs seek a ruling that C&A is liable for rent payments through the life of the lease, even though the commercial building no longer exists.  And finally, Plaintiffs seek a ruling that all other Defendants are jointly and severally liable to cover total costs of rebuilding and outstanding rent.

Defendants opposed Plaintiffs' motion.  Dkt. Nos. 109 (Kaneshiro and Ishibashi), 113 (Wong), 115 (RED2), and 119 (C&A).  Defendants contend that the $2 million insurance coverage was adequate because it was reasonably based upon "a $1.8 million estimate for total reconstruction that was prepared by a knowledgeable independent insurance agent with the assistance of a knowledgeable cost estimator in May 2023, just three months prior to the Maui fires."  Dkt. No. 109, at PageID.1065.  In Defendants' view, the "adequacy of insurance must be determined as of a point in time prior to the

8

Maui Fires, which w[ere] extraordinary and unforeseeable." *Id*. at PageID.1072 (cleaned

up). Defendants warn that a "contrary rule would improperly impose a hindsight-

based standard untethered to reasonable foreseeability." *Id.* at PageID.1073. Such a

rule, in their view, "would be unworkable in practice, as it would require parties to

insure against unforeseeable catastrophic events based on hindsight." *Id.* Defendants

also argue that "[f]rom a public policy standpoint, if insurers were compelled to

estimate costs of such unforeseeable events, it would quadruple the cost of insurance

(just as Plaintiffs are asserting here)," which would "inevitably lead to individuals and

corporate entities not insuring their property" because doing so "would become an

*impossible* obligation." *Id.*

The Defendants other than C&A also argue that, at most, C&A is the only party

liable for total replacement costs and rent. According to these Defendants, the

"obligations at issue—maintaining adequate insurance, rebuilding improvements, and

paying rent post-loss—are inextricably tied to use, possession and control of the

property." *Id.* These "operational covenants," in Defendants' view, cannot be extended

to parties who no longer have any "use, possession or control of the premises." *Id.*

Defendants further contend that Plaintiffs have waived or forfeited their right to

complain about the adequacy of the insurance because a factfinder could find that they

did not, at any time prior to the fires, enforce the provision of the lease that requires a

lessee to place insurance jointly in the name of lessor and lessee, and because a factfinder could find that Plaintiffs accepted the amount of insurance that C&A secured.

RED2 also filed its own cross-motion for summary judgment, Dkt. No. 111, which Plaintiffs and Defendants Kaneshiro and Ishibashi oppose, Dkt. Nos. 128 (Plaintiffs) and 150 (Kaneshiro and Ishibashi). In it, RED2 argues that FHB and its assigns agreed to be liable for lease obligations "only during the period such party has possession or ownership of the Leasehold Estate." Dkt. No. 111, at PageID.1169. RED2 further contends that "FHB intended to assign—and RED2 intended to accept—FHB's right to acquire the Leasehold Estate through foreclosure." *Id.* And because RED2 did not have possession or ownership of the leasehold estate when the alleged breaches occurred, RED2 contends it has no liability. In their opposition, Plaintiffs point out that RED2—not FHB—purchased the lease in foreclosure proceedings. Plaintiffs contend that RED2 cannot rely on the language protecting FHB and its assigns because FHB never acquired or took possession of the lease, and thus RED2 cannot be viewed as FHB's assignee. In reply, RED2 counters that FHB assigned its right to purchase the leasehold estate in foreclosure to RED2, and that this is what makes RED2 FHB's assignee. Dkt. No. 133.

//

//

//

10

### 4.      Supplemental Proceedings Concerning Certification

After briefing on the summary judgment motions was essentially complete,[2] this court issued an entering order noting that it was "inclined to certify one or more questions to the Hawaiʻi Supreme Court because the motions raise issues of Hawaiʻi state law that do not appear to have been definitively resolved by the Hawaiʻi Supreme Court in the context presented here." Dkt. No. 134. This court invited the parties to submit supplemental briefing on whether the court should certify questions and, if so, how those questions should be drafted. *Id.* The parties timely filed responses to this court's entering order. Dkt. Nos. 138 (Plaintiffs), 139 (Wong), 140 (RED2), 141 (Kaneshiro and Ishibashi), and 142 (C&A). In these responses, Plaintiffs opposed certification on the ground that the decisions in *Jones v. Dieker*, 39 Haw. 448 (1952), *Broida v. Hayashi*, 51 Hawaiʻi 493, 464 P.2d 285 (1970), and *Hi Kai Inv., Ltd. v. Aloha Futons Beds & Waterbeds, Inc.*, 84 Hawaiʻi 75, 929 P.2d 88 (1996), constitute clear controlling precedent. Defendants, for their part, argued that certification is warranted.

The court held a hearing on May 26, 2026, at which it heard arguments on whether questions should be certified. Dkt. No. 144. During that hearing, the court inquired into whether the record, as currently developed, adequately demonstrated that the questions presented are sufficiently "determinative of the cause" to satisfy Hawaiʻi

---

[2]     Defendants Kaneshiro and Ishibashi filed their motion for partial joinder in Plaintiffs' opposition to RED2's cross-motion for summary judgment at a later date. Dkt. No. 150.

Rule of Appellate Procedure 13(a).  Dkt. No. 143.  To develop a fuller record on that issue, the court authorized Plaintiffs to supplement their motion for summary judgment.  Dkt. No. 144.

Plaintiffs filed their supplementation on June 9, 2026.  Dkt. No. 147.  In it, they argue that this court should conduct a damages-only mini-trial, determine the precise amount of damages at issue, and then certify liability questions only after that trial has been held.  *Id.*  The logic of their argument is that since Defendants have not conceded that the total cost of repairs exceeds $2 million, it remains unresolved whether any Defendant will owe any amount of money beyond what the insurance proceeds can cover on their own.  But as Plaintiffs acknowledge, the only noticed expert reports on total costs of repairs make estimates in the range of approximately $6 million to $8 million.  No other expert was timely disclosed, and "[n]o Defendant disclosed any lay witnesses on rebuilding cost."  *Id.* at PageID.2241.

Defendants filed their responses to Plaintiffs' supplementation on July 15, 2026.  Dkt. Nos. 152 (Kaneshiro and Ishibashi), 153 (RED2), 154 (Wong), and 155 (C&A).  They oppose Plaintiffs' request for a damages-only mini-trial, and repeat their contention that certification is warranted now.

## DISCUSSION

Hawai'i Rule of Appellate Procedure 13(a) provides that "[w]hen a federal district or appellate court certifies to the Hawai'i Supreme Court that there is involved

in any proceeding before it a question concerning the law of Hawaiʻi that is determinative of the cause and that there is no clear controlling precedent in the Hawaiʻi judicial decisions, the Hawaiʻi Supreme Court may answer the certified question by written opinion."

The questions certified here satisfy these standards. There is no clear controlling precedent in Hawaiʻi judicial decisions, and the questions are determinative of the cause.

### A.    There Is No Clear Controlling Precedent

To begin with, there is no clear controlling precedent in Hawaiʻi judicial decisions. Although Hawaiʻi Supreme Court decisions do provide guidance, and a court could reason by analogy from these precedents, they are not clearly controlling.

### 1.    The First Certified Question

The first certified question concerns whether the $2 million insurance policy was adequate. No party disputes that this is an important and likely recurring question of state law, particularly in the wake of the 2023 Maui fires. But Plaintiffs oppose certification because, in their view, the Supreme Court of the Territory of Hawaiʻi "squarely addressed the contractual obligations of a lessee after fire under a lease imposing both a duty to rebuild and a duty to insure with a make-up-the-deficiency provision" in *Jones v. Dieker*, 39 Haw. 448 (1952). Dkt. No. 138, at PageID.2183-84.

Plaintiffs are correct that the lease in *Jones* contained similar language to the lease

involved here.  39 Haw. at 450 (recounting lease terms providing that "in case said

buildings and improvements . . . shall at any time be destroyed or damaged by fire, then

. . . the Lessee shall rebuild and reinstate or replace and repair").  But while the lease in

*Jones* was similar, the legal questions presented were different.[3]  And that difference

makes *Jones* a poor candidate for "clear controlling precedent."  Haw. R. App. P. 13(a).

In *Jones*, a lessee obtained a $5,000 insurance policy for furniture on leased

premises.  Although the policy was meant to cover the furniture of the lessor, the lessee

"from time to time replaced lost or destroyed furniture of the lessors with furniture of

her own."  39 Haw. at 458.  Despite this commingling, the lessee "had not insured that

separate property and had no insurable interest in the original or replaced furniture of

the lessors."  *Id.*  A fire destroyed the furniture in the building and the insurance

company paid out the full amount of the policy in the sum of $5,000 to the lessors.  This

amount, the Supreme Court of the Territory of Hawai'i observed, was "insufficient in

amount to replace" the lessors' "destroyed furniture and equaled but a fraction of its

---

[3]     The parties correctly focus on the last issue addressed in the *Jones* opinion, which
was the one issue raised in a cross-appeal.  39 Haw. at 457-58.  Several other issues were
raised in the appeal itself:  (1) whether the lessee's abandonment of the premises
constituted an abandonment, or whether the lessors instead had engaged in a
constructive eviction, *id.* at 450-55; (2) the reasonableness of attorney's fees awarded
below, *id.* at 455-56; and (3) whether a lien for attorney's fees was appropriate, *id.* at 456-
57.  But those aspects of the *Jones* opinion are not relevant to this first certified question.

14

replacement value."  *Id.*  Yet "the lessee ha[d] not performed her obligation under the lease to make up the deficiency out of her own funds."  *Id.*

The Court in *Jones* did not explore the question of how to assess the adequacy of insurance coverage—whether before or after the fact.  Nor did it have any occasion to consider whether the "surge" factor should be included, as the fire in *Jones* did not cause any significant damage beyond the building itself.  In fact, the inadequacy of the $5,000—on which the circuit court below had made findings of fact—was taken for granted on appeal.  *Id.* (noting only that "*apparently* [the lessee] did not fully insure their furniture, the policy covering that furniture being in the amount of $5000 and the replacement value of such furniture being more than three times that amount, as evidenced by the lessee's inventory thereof, as well as found by the chancellor" (emphasis added)).

The question in *Jones* was, instead, whether a lessee who had "apparently" not obtained adequate insurance to cover the lessors' furniture was, nonetheless, entitled to take some of the insurance proceeds to replace furniture of her own.  The Court answered that it "would be sustaining a pure gratuity at the expense of the lessors for this court to" allow the lessee to take "a share of the insurance proceeds."  *Id.*

//

//

//

15

So while *Jones* could be parsed for guidance on how to determine the adequacy of insurance coverage for fire damage,[4] it does not answer the questions presented here: what standards should be used to measure the adequacy of insurance coverage against fire loss, and whether a lessee must anticipate the possibility of "surge" pricing arising from a catastrophic fire that destroys not only the insured building but the entire geographic area in which the building is located.

In short, *Jones* does not constitute "clear controlling precedent" within the meaning of Rule 13(a), and no party has identified any other precedent that would.

### 2.     The Second Certified Question

The second certified question asks whether C&A is liable to continue paying rent through the life of the lease, even though the commercial building and the entire surrounding area were destroyed by fire.  Plaintiffs oppose certification of this question on the ground that *Hi Kai Inv., Ltd. v. Aloha Futons Beds & Waterbeds, Inc.*, 84 Haw. 75, 929 P.2d 88, is clear controlling precedent.  They note that in *Hi Kai*, the Hawai'i Supreme Court recognized that under "the common law, if a tenant breaches a lease, a

---

[4]     For example, the Court in *Jones* remarked that the lease "means exactly what it says" in that the lessee was "obligated either to rebuild and reinstate or to replace and repair," and that the lessee was required to "make up the deficiency out of [its] own funds."  39 Haw. at 450-51.  Plaintiffs argue that this language stands for the proposition that the adequacy of insurance must be measured after the fact, and that lessee must cover whatever it costs to rebuild, including the surge factor.  While that is a possible extension of the Court's language in *Jones*, this court cannot say that that language— made in a case that did not directly raise questions about how to evaluate the adequacy of insurance coverage—is "clear controlling precedent."

landlord may:  (1) terminate the tenancy and sue for damages under breach of contract theory; (2) elect to continue the tenancy, and sue periodically for rent as it accrues; or (3) terminate the lease, retake possession, and absolve tenant from all responsibility." *Id*. at 80, 929 P.2d 88, 93.  Plaintiffs contend that they have invoked the first option, and that they are therefore entitled to damages for the full amount of rent owed throughout the life of the lease.

But the question presented here is not whether a lessor ordinarily would have the right to terminate the lease and sue for damages.  It is instead whether that option is still permissible when the leased building has been completely destroyed in a fire that has also destroyed much of the surrounding town.  The question, in other words, is whether lessees in Lahaina and other parts of Maui must continue to pay rent, through the full life of existing leases, for properties that were completely destroyed in the catastrophic fires.  Plaintiffs argue that the lease requires C&A to continue paying rent even under these circumstances, because the lease explicitly allows for rent relief in the event of condemnation proceedings and does not explicitly provide for any other form of relief.  In Plaintiffs' view, the inclusion of this one form of rent relief eliminates the possibility of any other forms.  Dkt. No. 103-1, at PageID.779.  One might also say that because the lease explicitly contemplates that the lessee will secure insurance coverage for destruction of the building by fire, and that the lessee has an obligation to repair or replace the building following a fire, that the lease reflects an understanding that fire

17

damage is a foreseeable event—and that it therefore should not excuse the lessee's contractual obligation to pay rent through the lease term. *Cf. Jones*, 39 Haw. at 450-51 (observing that a lessee was responsible for continuing to pay rent on a building destroyed by fire "unless she established . . . her affirmative defense of constructive eviction").

But it is one thing for a building to be burned down in a fire, and quite another for an entire town to be destroyed. In the latter case, the lessee cannot return the commercial building to usable form merely by expeditiously rebuilding it. The entire geographic area—here, the town of Lahaina as a whole—must be repaired for any commercial building within it to continue to have economic value. And any individual lessee cannot bring that broader recovery about on their own. Thus it is far from clear that a lease should, under these circumstances, be interpreted as imposing on a lessee the economic burden of continuing to pay rent through the life of a lease. In doctrinal terms, one way to frame the question is to ask whether the frustration of a lessee's purpose, in a situation like that prevailing in Lahaina, is "so severe that it is not fairly to be regarded as within the risks that [it] assumed under the contract." Restatement (Second) of Contracts § 265 (1981); *see also Lindner v. Meadow Gold Dairies, Inc.*, 515 F. Supp. 2d 1154, 1160-63 (D. Haw. 2007) (discussing the contract doctrine of frustration of purpose under Hawai'i contract law).

The parties do not cite any Hawai'i judicial precedent that clearly controls on this question. Nor has this court identified any. And so, given the potentially significant practical and policy consequences of accepting Plaintiffs' argument, certification of the question is warranted so long as it is determinative of the cause (a matter taken up below).

### 3. The Third and Fourth Certified Questions

The last two certified questions ask whether the prior lessees—that is, Defendants other than C&A—should bear any liability for C&A's alleged breaches of the lease.

No party has identified any clear controlling Hawai'i judicial precedent on the fourth question: whether an entity that obtains a lease in a foreclosure sale (like RED2 here) and then sells it shortly thereafter is liable for the breaches of the lease that occur well after that sale. But Plaintiffs oppose certification of the third question because, in their view, it is resolved by *Broida v. Hayashi*, 51 Haw. 493, 464 P.2d 285 (1970).

It is true that *Broida* recognizes the "general rule" that "unless otherwise expressly or impliedly agreed, the original lessee remains liable on privity of contract to the lessor after an assignment even though the assignment is assented to by the landlord." 51 Haw. at 495, 464 P.2d at 287. And Plaintiffs note that this general rule is consistent with the Restatement (Second) of Property: Landlord and Tenant § 16.1 (1977), under which an assignor-lessee "continues to be obligated after the transfer if . . .

the obligation rests on privity of contract, and he is not relieved of the obligation by the person entitled to enforce it."  Plaintiffs further note that the lease in this case was entered in 1974, "four years *after Broida.*"  Dkt. No. 138, at PageID.2184.  This means that the "contracting parties" may be "presumed to have transacted against the backdrop of that holding."  *Id.*

The court agrees that *Broida* answers the question of whether prior lessees generally continue to be liable for the payment of rent.  The question in *Broida* specifically concerned such an obligation, and the Court recognized that the obligations travel with the continuing privity of contract through the chain of prior lessees.  Although the Hawaiʻi Supreme Court could, of course, choose to modify *Broida* in the specific context of catastrophic fires, this court accepts that *Broida* qualifies as clear controlling precedent as to rent.

But *Broida* does not answer the question of whether prior lessees are bound by the obligation to ensure adequate insurance coverage against fire loss.  Prior lessees generally do not have the right to access a building they no longer lease.  They generally have no right to be named as a joint insured on insurance policies, and lack any practical ability to monitor whether insurance continues to be adequate after they have assigned the lease.  And unlike a rent obligation—which is a fixed amount defined by the lease—the obligation to secure adequate insurance against fire loss is one that requires constant review and updating as circumstances change.  These considerations

20

could support the view that the obligation to secure adequate insurance is one that requires, not merely privity of contract (which prior lessees generally have), but also privity of estate (which prior lessees generally no longer have). *See Broida*, 51 Haw. at 498, 464 P.2d at 289 (explaining that while prior lessees remain "liable on their contractual undertaking" even after an assignment, "[c]learly assignment . . . severed privity of estate"). Because nothing in *Broida* answers this question—and because no other possible candidate for clear controlling precedent has come to this court's attention—the question is properly certified so long as it is determinative of the cause. The court turns to that issue next.

## B.     The Certified Questions Are Determinative of the Cause

This case is currently at the summary judgment stage, and the parties have raised arguments on which they believe they could prevail as a matter of law. If the motions are denied in whole or in part, the case will proceed to trial, at which additional arguments may be raised by any party.

Each of the certified questions is determinative of the cause, either because it will determine an aspect of the summary judgment litigation or because it will determine an aspect of the trial.

As to the first certified question, if the Hawaiʻi Supreme Court were to conclude that the adequacy of insurance is to be measured before the fact—rather than after the fact—the only remaining question for trial will be whether the $2 million policy was a

reasonable before-the-fact measurement.  If, by contrast, the Court concludes that it is measured after the fact, then the trial will revolve around that latter question.  And what the Court says about the inclusion or exclusion of the "surge" factor will similarly shape what factual questions must be resolved at trial.

The second certified question is similarly determinative.  If the Hawaiʻi Supreme Court were to conclude that the rent obligations are excused under the circumstances presented here, then an aspect of Plaintiffs' claims would be dismissed.  By contrast, if the Hawaiʻi Supreme Court concluded that the rent obligations continue to be owed, then that claim will proceed to trial for a precise determination of the damages owed.

Same for the third and fourth questions:  if liability does not extend to RED2 or to the other Defendants, then they will be dismissed from this case.  If the Court concludes that liability does extend, then all of these Defendants will proceed to trial.

Plaintiffs have, to be sure, raised the fair point that this court cannot, at the summary judgment stage, definitively resolve how much it will cost to replace the commercial building.  That is a matter that can only be resolved at trial.  And so Plaintiffs have proposed the possibility of this court holding a reverse-bifurcated damages-only trial to make hypothetical damages findings before certification of the liability questions is done.  Dkt. No. 147.  The court has carefully considered that proposal, but ultimately agrees with Defendants that it would not be feasible to make factual findings about damages without first obtaining the Hawaiʻi Supreme Court's

22

guidance on how those damages should be measured—that is, how liability should be assessed in the first place. *Cf. Bolos v. Waldorf-Astoria Mgmt. LLC,* Civ. No. 23-00104, 2025 WL 3177399, at *7 (D. Haw. Nov. 13, 2025) (concluding that certification was appropriate because, among other things, "the answer to the certified question appears to be the critical component to estimate the total amount of possible damages for the Plaintiffs' case"), *certified question answered by* 158 Hawai'i 147, 588 P.3d 1160 (2026). The court therefore concludes that certification is warranted now, even though there will need to be further proceedings in federal court after receiving the Hawai'i Supreme Court's guidance.

*   *   *

The court recognizes that certification is "a matter of judicial discretion," and that a federal court generally "should not certify questions when the answer is reasonably clear and the court can, using its best judgment, predict how the Hawai'i Supreme Court would decide the issue." *Bolos*, 2025 WL 3177399, at *8 (cleaned up). But the questions presented here are important and likely to recur, are likely to have significant practical and policy effects on individuals and companies on Maui (and elsewhere throughout the State), and are not, in this court's judgment, readily answered by reference to the decisions of Hawai'i state courts. Under these circumstances, the court concludes that rather than offering up its own prediction of how state law should be interpreted, certification to the Hawai'i Supreme Court is warranted.

## CONCLUSION

For the foregoing reasons, the court certifies the above-referenced questions, *see supra* p. 2, under Hawaii Rule of Appellate Procedure 13(a). This court's "phrasing of the question[s] should not restrict the [Hawaiʻi Supreme Court's] consideration of the problems and issues involved. The [Hawaiʻi Supreme Court] may reformulate the relevant state law questions as it perceives them to be, in light of the contentions of the parties." *Bolos*, 2025 WL 3177399, at *8 (cleaned up).

A formal "Certificate of Questions," as required by Rule 13(b), will be filed separately in the court's docket. The Certificate incorporates this order by reference.

IT IS SO ORDERED.

DATED: August 12, 2026, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

---

*Charles D. Stark* et al. *v. Gerald Kwockhen Wong* et al.; Civ. No. 25-00207 MWJS-RT;
AMENDED ORDER CERTIFYING QUESTIONS OF LAW TO THE HAWAIʻI
SUPREME COURT